DOUGLAS v. FRANKS.

4-8343                                    206 S. W. 2d 11

Opinion delivered December 1, 1947.

*Tom Kidd,* for appellant.

*Boyd Tackett* and *Alfred Featherston,* for appellee.

GRIFFIN SMITH, Chief Justice. G. C. Douglas has appealed from a judgment that he pay Robert Franks $1,250 as the balance of a broker's commission on sale of a sawmill.

The property, including timber,[1] was in California. Franks resides at Glenwood, this State, and in the complaint alleged that he was a licensed realtor, doing business in Pike County.

When Douglas expressed his purpose to sell a half interest in the mill, Franks discussed the matter with him. He testified that Douglas "offered him" an equal partnership in the business if he would go to California and operate the mill. This proposal was declined by Franks, who in the alternative said he thought a buyer could be procured. Initially Douglas insisted he would

---

[1] It is not shown whether the timber was standing, or in the form of logs to be cut into lumber.

require $10,000 in cash for a half interest, but when Franks countered with the assertion of a belief that he could "sell tomorrow," but probably would be unable to get the full amount in cash, Douglas agreed that with a down payment of $5,000 the deal could be closed and Franks' commission would be any sum in excess of $10,000. After Douglas had been paid $5,000, the next installment was to go to Franks; or, as he testified, ". . . from the next money he got I was to get $1,250, and the mill was to pay it out."

Edward A. Goble, referred to by Franks as being a playboy who was "afraid he would have to go to war," readily agreed to buy, and made the payment demanded. A short time later Goble and Douglas went west, presumably to look after the sawmill business. March 28th, 1945, Douglas wrote Franks from Nevada City, Calif., stating that Goble had paid $1,250. In the letter Douglas said: "I [have received my bank statement], so I guess [Goble's check] cleared, so am sending you check. Please cash it out of town so people won't know our business. In writing me, don't mention the check, as Ed [Goble] gets our mail."

When Douglas returned to Glenwood he told Franks that as a partner Goble was unsatisfactory. Franks testified he knew all the time Goble didn't know anything about running a sawmill. Douglas is alleged to have told Franks he did some trading with Goble, "and rockered around to get out with some engines." But, said Franks, "when Goble came back to Arkansas he didn't have any engines or motors: Douglas owned them all." Franks asserted that Douglas then told him Goble hadn't paid, "and I'm not going to pay you until I get all my money." In answer to this declaration Franks says he told Douglas he would sell the interest to someone else, "and Douglas agreed that if I sold to somebody else upon any kind of terms it would be all right."

Franks testified he sold the Goble half interest to O. W. Vaughan, a resident of Nevada City. In a deposition

Vaughan explained that he purchased for $4,000.[2] Appellant objected to introduction of the deposition for want of notice, but inasmuch as Douglas admitted the sale and conceded the agreed price was $4,000, no possible harm attached to the use made of it.

Testimony given by Douglas regarding his sale to Goble corresponds substantially with Franks' version. Variance was that Douglas said he agreed to accept a first payment of $5,000 ''on condition that the rest be paid out this year.'' There is no dispute about the next payment of $1,250, and it went to Franks. However, Douglas testified that Franks asked him not to let Goble know a commission was to be paid, adding, ''[because] I am going to get a good suit of clothes off of Ed.''

Douglas admitted receiving an additional $750 from Goble, but undertook to explain that ''in reality'' the item of $4,000 was not all in cash, ''but was considered as such.'' The items of $5,000, $1,250, $750, and $4,000 total $11,000.

On cross-examination it was sought to get an admission from Douglas that in various ways he had received $12,250. This was strenuously denied. On direct questioning mention was made of a saw in connection with the payment of $4,000. The witness had said, ''I got $4,000 out of Mr. Vaughan—that was, I think, just a little bit more. There was a saw in it—four thousand and some odd dollars; it would cut me down. That didn't go in the deal, but cut me down $435 and didn't go in this.'' Then Douglas added, ''I have never got any ten thousand dollars yet.'' Cross-questioned, Douglas was asked, ''Now then, what did you do about those engines that you got from Mr. Goble?'' The answer was (quoting from appellant's abstract): ''Franks said he had a man that could run the mill. I was 'stuck.' There wasn't any way in the world I could get out without taking a loss. . . . We had been going in the hole every day. I said [to Goble], 'Ed, what will you take for your interest?' [And he replied]: 'What will you give me?' It turned out that

[2] Vaughan began making payments May 1, 1946, and completed them September 1, 1947.

we sold one engine for $600 and I gave him credit for $1,250 on the contract, but I didn't get it. I had to take a loss—it was painful the loss I had to take.''

Counsel for appellee undertook to construe this testimony as an admission that Douglas received from Goble $5,000, $1,250, $750, "and then you credited him with $2,000, didn't you?'' Answer, "Oh, no!'' Q. "Didn't you say you gave him credit on some notes for $2,000 for the engines?'' A. "Half interest in the engines: he didn't have them under the deal, but,'' (interrupted)—"how much did you give him for that half interest in them?'' A. "I gave him credit for $1,250 to get out.'' Q. "Isn't $1,250 plus $7,000, $8,250?'' A. "There was no $1,250.'' Q. "There was $12,250 and the whole deal closed?'' A. "No, sir. There was a saw in there for $435.''

We must concede our inability to say with reasonable assurance of certainty just what this witness meant by some of the references. However, he definitely testified that entire receipts from the sales were less than $10,000. The only reference to $2,000 as a separate item was put into the record by appellee's counsel in the form of a question. Probably this was intended as the sum of $1,250 plus $750, but whether Douglas had in mind the admitted payment of $1,250 made by Goble and then sent to Franks, or the nebulous transaction connected with engines, is not clear enough to raise a reasonable inference against the witness. Apparently Douglas owned a half interest in the engine or engines, for he mentions receiving $600, "but gave credit for $1,250.''

What appears most probable is that the jury took the items aggregating $7,000 (that is, $5,000, $1,250, and $750) and added to the result Vaughan's payment of $4,000, making $11,000. To this total the difference of $1,250 was inferred from appellant's statement that he received $600 from sale of the engine and gave credit for $1,250. But the error in this calculation lies in the fact that Douglas was to have received $10,000 *net*, with excess to Franks. It is true Douglas received Goble's second payment ($1,250), but this immediately went to Franks, with the result that Douglas got the initial pay-

ment of $5,000, the Vaughan payment of $4,000, then $600 from sale of the engine; (with his interest in the engines unsatisfactorily apportioned) but Douglas says he did not collect the second item of $1,250, and there is no proof to the contrary.

Franks is in no position to complain that Douglas extended a gratuitous credit. After that had been done he appears to have again sold the half interest. In order to make the property available Goble had to be eliminated, and the settlement with Goble was to Franks' advantage in that title was cleared and Vaughan's $4,000 payment inured to the agent's benefit.

There is no substantial evidence from which the jury could have determined just what was intended by the references to engines, saws, etc. The case presents a fair example of undetermined facts—some of which were hinted at, but not established. It follows that the verdict was based on speculation. But, because some of the vague testimony was given by appellant, fairness requires that an opportunity be given for development of all essential facts. Hence, while the judgment is reversed, the cause is remanded for a new trial.